IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** ) <br> **TWO CELLULAR DEVICES,** ) <br> **CURRENTLY IN THE CUSTODY OF THE** ) <br> **ATF, ROANOKE FIELD OFFICE, UNDER** ) <br> **CASE 768045-23-0054 AS EXHIBITS 000041** ) <br> **AND 000042.** ) <br> ) | **FILED UNDER SEAL** <br><br> Case No.  7:23mj00133 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Knabb, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of two cellular telephones, more fully described below and in Attachment A, both currently in law enforcement possession, and the extraction from these devices of electronically stored information described more fully herein and in Attachment B.

2. I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and have been such since 2022. I am also a Detective with the Lynchburg Police Department ("LPD") and have been so employed since 2014. I was previously employed as a Police Officer with the Virginia Beach Police Department from 2006 to 2014. Since 2017, I have been assigned to investigate firearms violations, drug trafficking crimes, and violent gang activity as a member of the LPD, and later the ATF, Washington Field Division/Roanoke District Office. In investigating these matters, I have acted as case agent, undercover agent, and contact agent for confidential sources. In the past, investigations I have participated in have

1

employed search and seizure warrants, often resulting in indictments and criminal convictions for violations of state and federal law.

3. During my time as a law enforcement officer, I have received numerous hours of training in narcotics, firearms, explosives, and gang investigative techniques. I have received advanced training as a firearms instructor, explosive breacher and handler, and police counter-sniper. I have received basic and advanced training in a number of disciplines including Special Weapons and Tactics and undercover operations. Through the course of my duties, I have personally led and participated in numerous criminal investigations related to drug trafficking, criminal gang activity and firearms offenses. I have dealt directly with informants, suspects, and defendants, including experienced narcotic traffickers, about the methods and practices of drug dealing. This includes the methods and practices used by traffickers of methamphetamine, marijuana, heroin, fentanyl, and cocaine. I am familiar with how traffickers operate–in particular, how they communicate, distribute, store, and transport illegal narcotics. I am also familiar with how traffickers collect drug proceeds and launder those proceeds.

4. The facts in this affidavit come from my personal observations, training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience investigating drug trafficking, I am aware that that individuals engaged in buying and selling illegal narcotics use cell phones, including voice and text messages, to execute their crimes. I know that "smart" phones play an integral role in drug trafficking and that dealers use cell phones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephonic

conversations. I also know that it is common for narcotics traffickers to use multiple phones, including phones belonging to individuals other than themselves, to communicate with co-conspirators to compartmentalize their illegal activity and avoid detection by law enforcement.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6. The items to be searched are currently stored with the ATF under case number 768045-23-0054 as exhibits 000041 and 000042. The property consists of two cellular devices, identified as follows:

  a.  Exhibit 000041 is identified as a black Samsung cell phone with a charging cord; a picture below shows exhibit 000041



  b.  Exhibit 000042 is identified as a black iPhone in a clear case.; a picture below shows exhibit 000042

3



## STATEMENT OF PROBABLE CAUSE

7. The United States, including LPD and ATF, is conducting a criminal investigation of O'Shea Demond Jackson ("Jackson") and others regarding conspiracy to distribute heroin, fentanyl, cocaine, and methamphetamine in violation of 21 U.S.C. § 846, distribution of controlled substances in violation of 21 U.S.C. § 841.

8. In September of 2023, investigators began receiving information from a confidential informant ("CI-1") regarding Jackson's criminal conduct. CI-1 provided a phone number of (434) 221-6209 for a male they referred to as "Oshea" and showed text message communication between CI-1 and that number. Law enforcement was able to identify Jackson as the individual that CI-1 was referring to based on CI-1's physical description of Jackson, combined with law enforcements prior knowledge of Jackson through a previous investigation in

4

2017. During the initial communication with investigators, CI-1 positively identified a picture of Jackson from a police archive photograph.

    a. CI-1 is a 9-time convicted felon who is a registered confidential reliable informant with LPD. CI-1's criminal conduct includes but is not limited to probation violations, several firearms and narcotics offenses, and crimes of moral turpitude including credit card larceny. Law enforcement apprehended CI-1 with a firearm in the fall of 2022, and, for potential consideration towards the disposition of his/her crimes, CI-1 began cooperating with law enforcement. During CI-1's cooperation, CI-1 was interdicted with a distributable amount of marijuana outside of Virginia. As such, CI-1 is also working for consideration on those charges. While CI-1's track record and criminal history are significant, law enforcement is unaware of any false or misleading information provided by CI-1 during his/her cooperation with law enforcement. Law enforcement has found CI-1's information to be truthful and reliable.

    b. Jackson has a criminal history that includes, but is not limited to, multiple convictions for possession of a firearm by a felon and distribution of controlled substances. Jackson was recently released from prison in June of 2023.

9. At law enforcement direction, CI-1 spoke to Jackson about the prices of ounces of cocaine and heroin. CI-1 informed law enforcement that he/she believed Jackson had a source of supply in New Jersey where Jackson was obtaining heroin, cocaine, and pressed fentanyl pills.

10. On September 14, 2023, law enforcement conducted a controlled drug purchase from Jackson utilizing CI-1. During this incident, CI-1 spoke to Jackson on a controlled call at (434) 221-6209 and arranged a purchase of 1 ounce of powder cocaine from Jackson for $1000 in Lynchburg, Virginia. As was the case in subsequent controlled purchases, in advance of the deal, law enforcement searched CI-1 to ensure he/she did not have any money or contraband prior to the transaction. CI-1 was provided with electronic surveillance equipment to allow investigators to both capture the transaction, as well as monitor it live time. CI-1 was also provided with controlled U.S. currency to purchase the drugs. As planned, CI-1 and Jackson met to conduct the deal. CI-1 provided Jackson with law enforcement's $1000 and Jackson handed over roughly one ounce of drugs. Later, law enforcement conducted a field test of the product purchased and it tested positive for a mixture of heroin, fentanyl, and methamphetamine. In reviewing the audio from the recordings, it appears Jackson mistakenly retrieved an ounce of fentanyl from his person as opposed to the cocaine that was discussed when CI-1 and Jackson prearranged the deal. After the fact, CI-1 informed law enforcement that CI-1 observed Jackson with approximately 8 to 10 ounces of narcotics during this transaction.

11. On September 21, 2023, the investigative team conducted a second controlled drug purchase from Jackson utilizing CI-1. During this incident, CI-1 arranged a purchase of one ounce of fentanyl and one ounce of heroin. Again, CI-1 spoke to Jackson using the (434) 221-6209 number to arrange the purchase. This deal was coordinated to occur at what law enforcement determined to be Jackson's residence, 462 Clearview Circle, Rustburg, Virginia. As discussed, CI-1 traveled to Jackson's residence where Jackson sold CI-1 a quantity of heroin and fentanyl in exchange for $2100 of pre-recorded U.S. currency. During this transaction, Jackson

spoke to CI-1 about purchasing 8 ounces of methamphetamine in the future in exchange for $1500.

12. On September 19, 2023, investigators obtained a Virginia state-issued search warrant to facilitate the real-time monitoring of location data on Jackson's cell phone using the number (434) 221-6209.

13. On September 22, 2023, the investigators observed Jackson's cell phone travel north bound through Amherst County, Virginia all the way to an area around Martinsburg, West Virginia. The phone appeared to stop for short period of time and then returned to Lynchburg. On this same date, CI-1 informed law enforcement that Jackson contacted CI-1 from (434) 221-6209 and told CI-1 that he (Jackson) was "up there" obtaining four ounces of methamphetamine, 1000 fentanyl pills and an unknown quantity of heroin and fentanyl. Law enforcement observed via the live location data that Jackson traveled a route through the mountains of Nelson and Amherst Counties while traveling back to Lynchburg, Virginia. In my training and experience, drug traffickers commonly utilize back roads and routes less common to minimize contact with law enforcement along major highways and interstates. Considering CI-1's conversation with Jackson along with the location data, law enforcement identified this method of travel to be consistent with a courier trip to obtain a larger supply of narcotics.

14. On September 27, 2023, the investigative team conducted a third controlled drug purchase from Jackson utilizing CI-1. This transaction occurred after the suspected courier trip on September 22, 2023. During this transaction, CI-1 again coordinated with Jackson at (434) 221-6209, and arranged a purchase of one ounce of heroin, one ounce of fentanyl, and 250 pressed fentanyl pills at Jackson's residence in Rustburg, Virginia. Jackson sold the CI the requested quantity of heroin and fentanyl in exchange for $3500 of pre-recorded U.S. currency.

During this transaction, CI-1 also spoke to Jackson about possibly purchasing methamphetamine as well as a larger quantity of fentanyl pills. Jackson quoted CI-1 a price of $250 per ounce of methamphetamine.

15.     Beginning on October 2nd, 2023, CI-1 began providing investigators with additional intelligence. Jackson told CI-1 that Jackson had sources of drug supply in West Virginia, Maryland, and New Jersey. CI-1 relayed that Jackson told CI-1 that Jackson was planning an out-of-state trip to resupply drugs on October 5 or 6 to acquire nine ounces of cocaine, nine ounces of heroin, nine ounces of fentanyl, some number of pressed fentanyl pills, and a pound of methamphetamine. Jackson explained to CI-1 that Jackson was waiting on his source of supply to be ready for the transaction.

16.     On October 10, 2023, CI-1 provided investigators with additional intelligence. CI-1 informed law enforcement that CI-1 Jackson was driving a Suzuki Sidekick SUV and would be headed to West Virginia to acquire narcotics, as it seemed Jackson's supplier was ready to deal.

17.     On October 11, 2023, investigators monitored live location data from Jackson's cell phone and observed it move north through Amherst County. Based on the route being traveled, this appeared to mirror the previous trip that occurred on September 22, 2023.  As it was apparent Jackson was traveling to obtain narcotics law enforcement initiated a response to attempt to locate and interdict Jackson. Consistent with the previous trip, it appeared Jackson traveled to the Martinsburg area, where he stopped off I-81 for a short period of time. Jackson then traveled back southbound on I-81, seemingly returning to Lynchburg.

18.     While following the location data of Jackson's cellular device, investigators observed Jackson's phone travel southbound on I-81 north of Harrisonburg, Virginia. I

personally assisted and physically observed a male matching Jackson's description operating a Suzuki Sidekick. Law enforcement was able to run the license plate and determine it to be the same vehicle that Jackson was known to operate prior to this trip, and consistent with CI-1's description.

19. Law enforcement followed Jackson as he drove on VA-151 in Afton, Virginia, which is in Nelson County in the Western District of Virginia. Nelson County Sheriff's Office Deputies were advised of the facts and circumstances and were asked to look for any possible traffic violations, in addition to the probable cause already developed, and ultimately interdict Jackson with a K-9 on-hand. Nelson County Deputies observed Jackson touch the center yellow line two times. As directed, Jackson was pulled over in Nelson County and officers identified Jackson as the driver, and April Davidson ("Davidson") as the lone passenger, seated in the front passenger seat. Davidson has a criminal history that includes, but is not limited to, drug paraphernalia, assault on law enforcement and forgery.

20. Davidson was *Mirandized* and admitted to being a heroin user, identifying a small heroin kit in the vehicle as her own. Further, she told police the couple traveled to an apartment complex in Martinsburg, West Virginia for reasons unknown to her and only for a short time. Davidson stated that she occasionally stays with Jackson, and they are good friends. Davidson stated that the vehicle they were operating belonged to her father, and she offered to drive the vehicle with Jackson when he was having a hard time finding a ride for their trip.

21. A narcotics detection K-9 scanned the free air around the vehicle and provided a positive alert which led to a search of the vehicle. That search revealed a shoebox, behind the driver's seat, that contained what is suspected to be: approximately 1.2 pounds of

methamphetamine, 4,800 pressed fentanyl pills, 100 grams of fentanyl powder, 100 grams of heroin, and 126 grams of cocaine.

22. While the substances were not field-tested due risks associated with fentanyl[1], I believe these substances to be illegal narcotics based on my training and experience. In addition to the large quantity of narcotics inside of the shoe box, law enforcement located a smaller quantity of cocaine on Jackson's person, tucked inside of his hat.

    a. Below is a photograph of the substances located in the shoe box behind the driver's seat.



---

[1] In summarizing the significance of the amount of narcotics seized, between the blue fentanyl pills and the powder fentanyl, law enforcement seized approximately 580 grams of fentanyl. Law enforcement does not know the purity of these substances yet. However, the Drug Enforcement Administration (DEA) has reported that a lethal dose of fentanyl can be 2 milligrams. Considering there are 1,000 milligrams in a gram, this computes to 580,000 milligrams. I have interdicted fentanyl in purity ranges from 3% to 100% purity. Even if the substance were to yield a mere 5% purity rate, it would compute to over 14,000 lethal doses.

23.     I physically observed Jackson holding Exhibit 000042 when deputies initially asked him out of the vehicle.  Exhibit 000042 is the cellular device taken directly from Jackson's person. Based on my training and experience, I believe exhibit 000042 to be the cellular device that law enforcement was tracking, and also the same cellular device being utilized to communicate with CI-1 to facilitate drug transactions. I also observed Exhibit 000041 lying on the passenger seat, where Davidson had been seated. I noted that the phone had an open GPS application with active directions displayed for the trip. Davidson identified a phone number for herself but did not directly identify her device in the vehicle. While there were numerous cellular devices located in the rear of the vehicle, they all appeared to be old, and all turned off. Exhibit 000041, which was lying in the seat Davidson was sitting in, appears to be a device she was using immediately prior to the stop.

24.     Given both of phones at issue appeared to be actively employed in facilitating narcotics offenses, I took both phones into law enforcement custody upon Jackson's and Davidson's on-scene arrests. While I did not discuss with either party the seizure of their phones, to my knowledge, neither objected. Moreover, since Jackson's arrest, he has remained incarcerated and is held without bond on charges filed in Nelson County. Davidson, also pending charges in Nelson County, was granted bond; however, to date, I have not received any request from Davidson to return her cell phone.

25.     I took custody of the items of evidence from the Nelson County Sheriff's Office and placed them into evidence with the ATF Roanoke Field Office. The drugs have been submitted to the Drug Enforcement Administration's Mid-Atlantic Laboratory for testing and are awaiting analysis. Jackson and Davidson were both taken into custody on October 11, 2023 and held on state charges. Jackson remains in custody and Davidson has bonded out.

26. From the time I seized these phones I have been in regular contact with both the Nelson County Commonwealth's Attorney and the US Attorney's Office. At the onset, a determination was made that a federal search warrant was appropriate given the interstate nexus to the offenses. Once that determination was made, to provide the most fulsome, detailed account of the facts known to law enforcement during this investigation in this affidavit, I have been working diligently to gather and review all evidence related to Jackson and Davidson, while balancing my other duties as law enforcement officer. This has included, but is not limited to, gathering reports and evidence from various state and local agencies. Prior to submitting this affidavit, I have reviewed and analyzed reports, collaborated with other law enforcement officers and prosecutors to accurately describe the case in its entirety. Any delay in submitting this affidavit is attributable to the volume of evidence, particularly leading up to the interdiction, and the need to synthesize the facts.

## **SUMMARY**

27. Based on the facts cited in this affidavit, I believe that a search of both cellular devices will yield evidence of drug trafficking crimes. First, Jackson used the same cell phone number to orchestrate three controlled drug transactions with CI-1. It is highly likely his phone will contain drug communications with CI-1 as well as Jackson's supplier and other clients of Jacksons. Additionally, Jackson's cell phone number was tracked to and from an area around West Virginia in September and again prior to the recovery of a large stash of drugs. It is also worth noting that law enforcement memorialized certain text messages between Jackson's number and CI-1 to further corroborate CI-1's version of events. Second, Davidson's phone was giving directions at the time it was seized so, presumably, at a minimum, a search of her device will provide location data related to Jackson's supplier. Her phone will also provide

evidence of the extent of her involvement and knowledge of the purpose of the drug run(s).  In sum, searching exhibits 000041 and 000042 will further this drug conspiracy investigation by identifying text message communications, location data and other relevant information to help assist in identifying sources of supply, co-conspirators and additional pieces of evidence relevant to the aforementioned drug trafficking operation.

## TECHNICAL TERMS

28. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. *Wireless telephone:* A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. *Digital camera:* A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. *Portable media player:* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.

13

    Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS:*  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA:*  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet:*  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. *Pager:*  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

14

      h. *IP Address:* An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      i. *Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29. Based on my training, experience, and research, I know that the devices described in Attachment A have capabilities that allow them to serve as wireless telephones, phone books, digital cameras, digital recorders, GPS Navigators, portable media players, and PDAs. In my training and experience, examining data stored on devices of this type frequently uncovers, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

31. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

      a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of these devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it contains evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A, in order to seek the items described in Attachment B.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Matthew Knabb*
Matthew Knabb, Task Force Officer
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Received by reliable electronic means and sworn and attested to by telephone on this  1st  day of November 2023.

_____
C. KAILANI MEMMER
UNITED STATES MAGISTRATE JUDGE